UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
BRITTANY HOPE,

                    Plaintiff,

    -against-

AMAZON.COM SERVICES, LLC and
SANDRA FINKELSTEIN,

                   Defendants.
----------------------------------------------------------------x

        **COMPLAINT**

        **JURY TRIAL DEMANDED**

       Plaintiff Brittany Hope ("Hope") or ("Plaintiff"), through her attorneys Berke-Weiss Law PLLC, complains of defendants Amazon.com Services, LLC ("Amazon" or the "Company") and Sandra Finkelstein ("Defendant Finkelstein") (referred to jointly as the "Defendants"), as follows:

<u>PRELIMINARY STATEMENT</u>

       1.     On July 4, 2021, the New York Times reported that Amazon was "on track to becoming the largest employer in the United States", but "in spite of solid wages and generous benefits it was quickly cycling through employees" (the "July 4th Report"). The July 4th Report asked "why" this was happening and took a close look at Amazon's strict rules about time off and attendance during the pandemic for an answer. They focused on "Amazon's practice of monitoring workers by the second and disciplining them for any unexcused pauses," known as "time off task" or "T.O.T." and looked to a "Times investigative report on…[Amazon]… that revealed systemic problems in its model for managing workers, such as unbridled turnover, minimal human contact, an error-plagued leave system, delayed benefits and mistaken firings,"[1]

---

[1] https://www.nytimes.com/2021/07/04/insider/amazon-workers-investigation.html (last accessed April 28, 2022).

to understand why an employer with good pay and benefits experienced high rates of employee turnover.

2.      Hope is a 29-year old woman who was recruited as a contract employee for Amazon in October 2019, before being promoted to a salaried Brand Manager for The Drop, the Company's exclusive fashion line, in December 2019.  As a full-time Amazon employee, she became subject to an 18-month non-competition agreement. Unfortunately, Hope started her position shortly before Covid descended on New York City, and Hope became one of its early victims.

3.      The Times focused its reporting on Amazon's warehouse staff but, based on Hope's experience, its office employees have been subjected to the same draconian employment policies.  The Times' reporting of Amazon's willingness to prioritize its warehouse employee monitoring practices over the needs of sick employees, mirrors Hope's experience of falling seriously ill with Covid in the early days of the pandemic only to be fired by Amazon when her struggles with long Covid made it challenging for her to be always on call by phone, email and text.  The Company's byzantine leave system failed to provide her with reasonable accommodations for her disability by refusing to accept doctors' notes provided in support of an extension of her disability leave period.  Instead, when Hope could not navigate the Company's leave process because of her severe long Covid symptoms, Amazon called it "job abandonment," and billed her $12,000 for a purported salary overpayment after making it impossible for her to get the disability leave and reasonable accommodations she was entitled to receive, while leaving the 18-month non-compete in place.

<u>NATURE OF ACTION</u>

4.      Hope is a 29-year-old woman who attempted to navigate Amazon's HR processes while suffering from complex long Covid symptoms. Amazon is the second largest employer in the United States, with near-boundless resources, power, and capital. Rather than offer Hope the support employees with disabilities are entitled to by law during the time Hope was hospitalized multiple times for her Covid related medical symptoms, Amazon started manufacturing purported performance issues, apparently in anticipation of needing a litigation defense.

5.      Prior to graduating from the University of Alabama in the fall of 2015 with a bachelor's degree in Apparel & Textile Design, Hope spent the summer studying at Paris American Academy. While there, she also interned for Paris Fashion Week, a coveted and competitive opportunity. Hope continued to develop her design, branding, and production coordination skills after graduation, working for a designer in Alabama prior to moving to New York City in 2018.

6.      Once Hope moved to New York City, she deepened her fashion experience. She took additional course work in Fashion Industry Essentials at Parsons and began working as the Head of Product Development & Production for Footwear and Handbags at Tibi, a New York based sportswear collection.

7.      Hope was successful at Tibi, and left for what she believed was a better opportunity when Amazon recruited her to become a Brand Manager at The Drop, Amazon's exclusive fashion line which was launched in 2019.

8.      This action is brought to remedy Amazon's discrimination and retaliation in the terms, conditions, and privileges of employment based on disability against Hope in violation of the Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101, *et seq.* (the "ADA"); the New

York State Human Rights Law, Executive Law § 290, *et seq.* (the "NYSHRL"); New York State Labor Law; and the Administrative Code of the City of New York § 8-107, *et seq.* (the "NYCHRL").

9.      Injunctive and declaratory relief, damages, statutory penalties, and other appropriate legal and equitable relief are sought pursuant to the ADA, New York Labor Law, NYSHRL, and NYCHRL.

JURISDICTION AND VENUE

10.     The Court has jurisdiction over Hope's ADA claims pursuant to 28 U.S.C. § 1331.

11.     The Court has supplemental jurisdiction over Hope's NYSHRL and NYCHRL claims pursuant to 28 U.S.C. § 1367 because these claims closely relate to Plaintiff's claims under the ADA, having arisen from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful employment practices complained of herein occurred within the Southern District of New York, including Hope's employment location at 950 Avenue of the Americas, New York, NY 10001.

13.     Pursuant to Section 8-502(c) of the New York City Human Rights Law, Plaintiff will cause to be served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

14.     Hope filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 25, 2021, complaining of the acts of discrimination and retaliation alleged herein. On or about February 2, 2022, the EEOC issued a Right to Sue letter,

attached here as <u>Exhibit A.</u>  Hope has complied fully with the administrative prerequisites of the ADA.

PARTIES

15.     Plaintiff is a resident of Brooklyn, New York. Plaintiff was employed by Amazon at The Drop's office located at 950 Avenue of the Americas, New York, NY 10001 from October 2019 until she was terminated on July 12, 2020.

16.     Hope is a 29-year-old woman who became seriously ill with Covid and long Covid beginning in approximately February 2020. Hope has had at all relevant times a "disability" as that term is defined in the ADA, NYSHRL and NYCHRL.

17.     Amazon has multiple offices in New York City, including where Hope worked for The Drop. Amazon is an employer within the meaning of the ADA, the NYSHRL, the NYCHRL and New York Labor Law.

18.     Defendant Finkelstein was a Senior Brand Director at Amazon for The Drop. Defendant Finkelstein was Hope's direct supervisor.

FACTUAL ALLEGATIONS

19.     In October 2019, Hope was recruited away from her position as Head of Product Development & Production at Tibi, where she had been working successfully for almost a year and a half, to start a 6-month contract as a Level 4 Brand Manager role at Amazon for The Drop. Amazon advertises The Drop as "limited-edition fashion collections designed by influencers," with its collections "dropping" for sale for 30-hour periods.  The resultant high turnover of the product made The Drop a particularly hectic place to work as employees raced to keep up with these 30-hour sale cycles.

20.     While acting as a Level 4 Brand Manager, Hope sat next to then-Brand Manager Sandra Finkelstein, who saw Hope's work ethic firsthand. When Defendant Finkelstein was promoted, she hired Hope to replace her as a full-time Level 5 Brand Manager for The Drop on or about November 25, 2019.

21.     Plaintiff initially expressed concern to Defendant Finkelstein about taking on a position with more responsibility because the work at The Drop was so hectic and time-consuming. Finkelstein assured Plaintiff that the work as a Level 5 Brand Manager for The Drop's "Staples" collection would be less hectic than Hope's work for the "Capsule" collection which Hope had been assigned to, because the goal of the Staples collection was to create fashion staples for consumers, rather than one-off collection sales. Defendant Finkelstein told Hope the job was a 9-to-5 position and Defendant Finkelstein modeled those hours by leaving the office at 5pm each day.

22.     When Defendant Finkelstein promoted Plaintiff to assume her prior role, she became Hope's direct supervisor.

*When Hope Became Ill Amazon Did Not Engage in the Required Cooperative Dialogue Process, and Began Criticizing Her Performance Instead.*

23.     On Monday, February 3, 2020, Hope became extremely ill, and was so sick that she could not leave her fifth-floor walkup apartment to seek medical assistance. She contacted a doctor who makes house calls to get medical assistance.

24.     The house call doctor diagnosed Hope with the flu and said she would continue checking in on Hope periodically, as Hope was very ill with an extremely high fever.

25.     Hope's sudden serious illness started before New York was aware of Covid, and prior to the pandemic's spread in the city, but Hope later realized she had been seriously ill with Covid and all the medical problems that illness presented.

26.     On February 5, 2020, Hope was home alone, suffering terrible sweats, a fever of 103 and chills which caused her to convulse in her bed. Hope's last memory of being at home was collapsing on the floor and urinating on herself, while she was trying to reach the bathroom.

27.     The house call doctor was concerned about Hope and came back after Hope was not answering her calls, but Hope did not answer the door.  The doctor broke into Hope's apartment and called an ambulance, which took Hope to New York Presbyterian, where she was admitted with a fever of 105.

28.     That same day, after Plaintiff had been out sick for five days, Kate Totaro, Defendant Finkelstein's direct supervisor, emailed human resources to complain about Plaintiff's work stating, "I wanted to give you an early heads up that we might have an issue with a new hire that we onboarded just at the end of December. Britt's been on the team since 12/23 and we've had some challenges getting the right level of work out of her in that time." Ms. Totaro inquired about what type of performance remediation Amazon offered for new employees like Hope.[2]

29.     Hope remained in the hospital for two to three days, surrounded by staff wearing hazmat suits. Hope's mother flew to New York from Alabama without knowing which hospital Hope had been taken to, ultimately locating her at New York Presbyterian. Hope's mother brought her home from the hospital on or about February 9, 2020, and stayed with her at Hope's apartment because Hope still was very ill.

---

[2] Amazon attempted to label their EEOC Position Statement and its supporting Exhibits as confidential in a footnote which erroneously listed another former employee's name. Amazon's footnote does not follow the EEOC requirements for claiming confidentiality. The EEOC does not accept efforts to maintain confidentiality through blanketed or unsupported assertions, instead requiring confidential information to be separated from a Position Statement in labeled attachments that are not provided to the Charging Party. The Position Statement and Exhibits that Plaintiff's counsel has received and references in this Complaint are therefore not confidential under EEOC rules and procedures. *See* https://www.eeoc.gov/employers/questions-and-answers-respondents-eeocs-new-position-statement-procedures.

30.     On February 11, 2020, Hope texted Defendant Finkelstein from her home stating: "Good morning Sandra. Just wanted to update you on my status. My mom flew in Thursday and has been helping take care of me through all of this. The doctors want me to give it one more day of rest and oxygen to try and get rid of the fluid in my lungs. I will be on email a little later in the day and back in office tomorrow." Defendant Finkelstein responded, "OK", offering no accommodations to her.  This was the first time Hope was able to communicate with her boss since her hospitalization.

31.     On or about February 18, 2020, Hope returned to the office where she was told to wear a mask by Kate Totoro, Defendant Finkelstein's Manager. Hope was not feeling completely well, but tried to keep up with her work despite her recent illness. No one asked Plaintiff if she needed any reasonable accommodations, even though she returned to work after her supervisor was aware that she had been hospitalized and it was obvious that Hope was not fully back to normal.

32.     On March 4, 2020, Defendant Finkelstein texted Hope acknowledging her hard work after her illness, "I appreciate all the long hours to get caught up! We will get there and I promise it will get easier on calendar."

33.     Later that day, Defendant Finkelstein texted Hope stating: "Not sure if you are checking easily [email] but Hey I hope you are feeling better. Ranjit [Johal] from HR will be reaching out to you to work up a plan for days you missed/may need to take moving forward. She's our VP HR manager and she's great!"

34.     Hope does not recall the precise dates when she spoke with Ms. Johal from HR, but does recall that at some point, Ms. Johal provided her with links to the Amazon intranet, but

did not discuss any potential accommodations, such as a shift in her work schedule or remote work.

35.     On March 5, 2020, Hope texted Defendant Finkelstein at 8:38 a.m. stating, "Having bad crying spells along with migraine so will wfh today if okay with you." Defendant Finkelstein responded, "Honestly I think that's tough! We have a mountain. If submits that's were not replied to Tuesday holding up production that I need to do. We also have to reply to a mountain of cads that I will have to do to get them started on samples… [sic]"

36.     Later that day, Defendant Finkelstein sent an email to Hope, complaining that Hope had failed to copy her on emails from the previous day, essentially accusing Hope of leaving her out of office communications. Defendant Finkelstein expressed frustration that she was not copied on emails about transporting materials within the office. Hope tried to explain that since she was out of the office dealing with a migraine and panic attacks, and Defendant Finkelstein was also out of the office that day, she had simply coordinated with a colleague who was in the office to pick up the materials.

37.     Despite Hope's reasonable explanation for why Defendant Finkelstein was not copied on the email, Defendant Finkelstein continued to question her about communications stating: "Where are the replies? Where is the sheet I started with color[?]" "What are they even doing for us?" Hope explained that they "went over everything together Monday evening," to which Defendant Finkelstein replied, "Where is all this documented[?]" "That's what I need[.]" "What's been replied to and what hasn't." Only when Hope responded that she was sending the requested documents, did Defendant Finkelstein's tirade end.

38.     Hope routinely had challenges sharing information with Defendant Finkelstein because Defendant Finkelstein was not familiar with using a Shared Drive. Hope maintained all

of her documents in a personal file on the Shared Drive, but repeatedly had to explain to

Defendant Finkelstein how to access shared materials, reminding Defendant Finkelstein that if

she saved materials on her own desktop, they were not viewable to her colleagues.

39.     On or around March 10, 2020, Amazon sent its employees home and directed

them to shelter in place.

40.     On or about March 17, 2020, Hope rented a car and drove to quarantine with her

parents in Alabama. Hope's parents had expressed concern about her remaining in New York

alone due to her recent health challenges, and encouraged her to come home.

41.     The transition to remote work was challenging for The Drop team, as they were

creating a method for virtual fittings, requiring frequent late-night calls with their factories in

India. Further, when Plaintiff had transitioned from a contract role to a full-time role at The

Drop, her "zukey," the physical item which allows employees to access the Amazon system and

was essential for allowing them to work remotely, was not properly upgraded to match her new

employment status. As such, Plaintiff had continued challenges accessing her Amazon work

email, requiring frequent communications with IT to try and resolve what was an intractable

problem.

42.     Defendant Finkelstein became increasingly irritated with Hope because of the IT

issues Hope was experiencing, even though the problems were beyond Hope's control. On or

about April 28, 2020, Defendant Finkelstein texted Hope, "The email computer situation is a real

problem, gotta say... it's holding up development and vendor replies as you know." She then

started questioning whether Hope was completing the work she said she had completed, writing,

"Honestly did the emails go out to vendors last night? I have zero vis. As to what you

accomplished." She also questioned why certain emails were still being sent, asking, "But why

do they eventually get sent? Like the edits .. they eventually got sent." Hope responded, saying, "I don't understand the tech side of this at all […] I have had to go back and recreate the edits email 5 separate times before they finally went through." Hope explained the considerable effort being invested in trying to push through her tech issues and complete her work, even though she continued to endure serious health problems.

43.     During this time, Hope was regularly working seventeen (17) hour days, while Defendant Finkelstein micromanaged Hope so intensely that it triggered the worst depression and anxiety Hope had ever experienced. The IT issues contributed to Defendant Finkelstein's micromanaging including bombarding Hope with daily questions like, "So what about today? What exactly did you send out yesterday and if you're [sic] emails were not going out last noon your time, were any coming in?"

44.     Hope found herself unable to leave her computer, since every time she stepped away, even to go to the bathroom, she would return to multiple messages from Defendant Finkelstein through Chime, Amazon's internal messaging and communication system, demanding to know Hope's status. Hope's parents began bringing her every meal to her desk while she was working from their house so she would not need to leave her computer.

45.     Hope started experiencing suicidal thoughts for the first time ever and felt like her mental health was unraveling. She got in touch with a psychiatrist, and was prescribed ADHD medication, antidepressants and anxiety medication.

46.     Hope confided in Defendant Finkelstein about her diagnoses, through Chime, in or around March 2020, and even shared that she had been having suicidal thoughts.

47.     Defendant Finkelstein's response was dismissive of Hope's mental health conditions, and once again Defendant Finkelstein did not address any potential accommodations,

instead going as far to say that she has a family member who has been in a psychiatric hospital multiple times, so she understands mental health issues, "but there's not much [she] can do."

48.     Although Defendant Finkelstein was well aware of Plaintiff's medical concerns, and Plaintiff shared some of her mental health struggles, Defendant Finkelstein apparently did not seek HR help and did not offer Plaintiff any accommodations, and at the same time she continued to communicate with Hope at all hours of the day and night.

49.     Beginning in April 2020, instead of trying to accommodate Hope's health issues, Amazon then invested their efforts into tracking what they perceived to be issues with Hope's work performance. Rather than offer Hope any assistance to help complete her job duties, Defendant Finkelstein created the "Britt Hope_Issue Tracker," dated April 1, 2020.

50.     Defendant Finkelstein wrote in the tracker on Friday, May 1, 2020, "EXTENDED FOCUS ONE MORE WEEK TO 5/8- THEN MOVE TO PIVOT [a formal performance improvement plan]."

51.     On May 4, Hope woke up with chest pain so intense that it made breathing difficult. She sought medical attention and received a Covid test which was negative. A pulmonary specialist at University of Alabama Hospital inspected scans of Hope's lungs and confirmed she had suffered lung damage consistent with Covid, specifically bronchiectasis and costochondritis.

52.     Hope's chest pain caused her to miss another week of work while she stayed in bed, where she was too weak to even sit up, let alone be tied to a computer.

53.     Despite Hope's severe illness and her communication to Defendant Finkelstein that she was seeking medical attention, Defendant Finkelstein continued to send constant text messages, often requesting items which Hope had already delivered. Plaintiff, in fear of losing

her job, felt she had no choice but to answer her boss's messages, despite being in and out of the hospital. Defendant Finkelstein knew that Plaintiff was in the hospital, but continued to text her questions, even making the patently ridiculous statement, "Awesome – is this all from the ER??"

54.     Defendant Finkelstein knew that Hope was "still very weak and [experienced] lots of pain breathing," but she persisted in questioning Hope regularly for updates on when she would be back in the office and asking for random pieces of information related to work.

55.     When Hope was out sick, Defendant Finkelstein lurched between checking in on Hope and demanding work product from her. The day Hope was in the Emergency Room with pneumonia, struggling to breathe, Defendant Finkelstein told her to "Rest," but later in the day she texted, "Paulina just found 10 styles without bullets for spring," prompting Hope to respond and confirm that she had already completed those assignments. Defendant Finkelstein responded, "Ok great- want you to rest but send those to me and Paulina it's an email she sent today thanks!"

56.     After saying she wanted her to rest, Defendant Finkelstein again reached out with a work question asking, "Are you uploading faryl images? Paulina asked me." This inquiry led to multiple additional work questions to which Hope responded with great difficulty. Finally, physically unable to keep responding to Defendant Finkelstein's barrage, Hope stated, "I'm barely able to sit up to see my computer right now" prompting Defendant Finkelstein to cease her questioning, and to respond, "Ok rest rest."

57.     According to the Britt Hope_Issue Tracker, Defendant Finkelstein had made a plan on Friday May 1, 2020 to "move [Hope] to PIVOT [on May 8, 2020]." However, on the next Monday, May 4, 2020, after Hope sought medical attention for her severe chest pain,

Defendant Finkelstein suddenly changed her plans: "Spoke to Kate about starting [Hope] on PIVOT. Britt still out sick."

58.     Upon attempting to return to work the next week, Hope was advised by Defendant Finkelstein to seek a medical leave of absence until her medical concerns were resolved.

59.     Hope was hesitant to go out on leave as she felt she could not afford to lose any pay, since she was paying for her apartment in New York and mounting medical bills.

60.     At this point, Plaintiff had been struggling with serious illness for approximately three months, and this was the first time that Defendant Finkelstein offered any accommodation, although she would not engage in any cooperative dialogue or the interactive process to discuss any form of accommodation other than leave.

61.     Defendant Finkelstein informed Hope that she would be paid at least 60% of her salary while on medical leave, and that she was not permitted to work during her leave.

62.     On or about May 12, 2020, Hope filed for a medical leave of absence through Amazon's internal Disability and Leave Services Portal and was told she would be contacted by her "case manager."

63.     Plaintiff was so confused by the process for requesting a medical leave of absence, and the directions from Defendant Finkelstein for doing so, that she initially applied for leave on or about May 12, 2020, for February 3 to May 11, 2020, since she understood that Defendant Finkelstein had wanted her to retroactively apply for that period.

64.     Once Hope requested a leave, she lost access to the company's intranet, which meant she could not access her work email, the Disability and Leave Services Portal, or Chime.

14

*Once Plaintiff Applied for Leave, She Lost Access to Amazon Communications and Struggled to Provide Requested Information, Leading to Her Termination.*

65.    Hope's Amazon case manager contacted her via telephone, and instructed Hope to have her doctor complete medical forms that would confirm her need for a leave of absence. The case manager explained that the Hartford, the insurance company used by Amazon to provide Short Term Disability, would be reaching out to her doctor for said forms and information.

66.    Despite being informed that she would be assigned a case manager from Amazon with whom she would have consistent contact, Hope had trouble communicating with her case manager, and was at a loss to understand how to successfully apply for leave benefits.

67.    Further, it seems that necessary documents from Amazon relating to Hope's disability leave, and which may have addressed some of the communication challenges she was having, were stuck in her employee portal and she could not access them after May 12, 2020, when she applied for medical leave and access to her email was cut off, creating a Catch-22 situation for Hope as she struggled to file the leave application.

68.    Amazon's convoluted leave process was extensively documented by Jodi Kantor, Karen Weise, and Grace Ashford in the New York Times on June 15, 2021, and in the July 4th Report. Many of the challenges with Amazon's leave process reported in the Times were experienced by Plaintiff, including: Amazon staff needing to go through phone trees to speak with someone in Amazon Leave Services; the inability to submit necessary medical documents; the loss of employee medical document submissions (apparently a "systems issue that had affected others as well") and; termination while on leave.[3]

---

[3] https://www.nytimes.com/interactive/2021/06/15/us/amazon-workers.html (last accessed May 2, 2022).

69.     On June 23, 2020, Ms. Johal, a Human Resources Business Partner at Amazon, emailed Hope to alert her that Amazon had still not received Hope's medical documentation required to take leave. Hope had previously understood that this document would be collected by the Hartford directly, as they had requested her doctor's contact information so they could fax the paperwork to his office. On June 29, 2020, Hope replied via email to Ms. Johal, "I do apologize this wasn't confirmed sooner and I've left messages with the details you explained below requesting an urgent callback, both last week and this morning."

70.     Ms. Johal replied to Hope, stating she or her doctor would need to return the Attending Physician Statement ("APS") to Amazon, not the Hartford, by July 6, 2020. Ms. Johal directed Hope to address any questions she had about the leave process to two different "case managers," Nicole Beckham and Max Marasigan.

71.     On July 3, 2020, Hope emailed the APS, which was filled out by Dr. Hanson, Hope's physician, on June 6, to Ms. Beckham and Mr. Marasigan for their review.

72.     Mr. Marasigan wrote to Hope on July 7, 2020, to let her know that her leave was approved from May 4 to July 12, 2020, and that her department had been informed of this.

73.     Sometime thereafter, Hope received a letter dated July 14, 2020, from the Hartford which stated: "Due to the date of your return to work, you would not be disabled beyond the 7 day beenifit [sic] commencement period for New York State disability, if you are disabled beyond 7/11/2020 please contact our office" (no punctuation). This letter did not make sense to Hope, who had already been on disability leave for more than two months by the time she received this message, and because she had recently been informed by Mr. Marasigan that this leave was approved by Amazon.

74.     On July 14, 2020, Hope received a notice of total or partial rejection of her claim for disability benefits from the Hartford, stating that her application was rejected because she had not provided proof of disability within 30 days.

75.     Hope understood that her doctor had sent the required documentation to approve her short-term disability to the Hartford. She also understood that the maximum amount of time possible for STD is 12 weeks, which would have been from May 11 to August 3, 2020; but, according to Amazon, their STD benefits are paid for up to 26 weeks. *See* https://www.amazon.jobs/en/landing_pages/benefitsoverview-us. Further, other forms of paid and unpaid leave are recognized reasonable accommodations.

76.     Between May 11 and July 26, 2020, Hope returned to New York from Alabama, seeking more consistent and long-term care for her worsening post-Covid symptoms including cardiac and neurological problems (e.g., racing heartbeat when resting, chest pain, fainting, seizures, dizziness, memory loss, confusion, etc.).

77.     On July 21, 2020, following another visit to her cardiologist due to syncopal episodes and her heart rate monitor coming back abnormal, Hope's treating physician wrote a note stating that Hope should continue to be excused from work until July 27, 2020, which Hope passed along to Ms. Johal and Mr. Marasigan.

78.     In case notes, Mr. Marasigan noted that he called Plaintiff on August 3, 2020, regarding her termination, but was unable to leave a voicemail. Mr. Marasigan further noted "ee has 21 days from denial date to turn in ppwk for review."

79.     While attending a doctor's appointment for her migraines in or around late July, Hope was informed that her health insurance had been canceled and she would therefore have to

pay for the visit out of pocket. This conversation is how she learned something must be wrong with her employment with Amazon.

80.      On August 5, 2020, Hope checked her personal email to find she had been terminated on July 12, 2020 due to "job abandonment." The termination letter stated that the date of her "voluntary" resignation "due to job abandonment" was July 12, 2020.

81.      Hope was shocked to learn of her termination, especially since Defendant Finkelstein had texted Hope regularly for months about all kinds of issues including her attendance and disability leave, and Defendant Finkelstein could have easily checked in with Hope prior to coming to the baseless conclusion that Hope had "abandoned her job."

82.      Previously, on May 22, 2020, Hope was informed via email that she had been "overpaid" by Amazon. The email stated that she was to repay both the gross overpayment amount of $13,269.24 and the net overpayment amount of $6,988.76 and requested that she send a repayment check to Amazon Corporate LLC.

83.      Amazon followed up on August 12, 2020, requesting $12,272.73 and attaching "overpayment statement" which lists different amounts other than $12,272.73, and provides no information about the time period of the alleged overpayment.

84.      Hope attempted to communicate with Amazon to obtain details on why she had been "overpaid" but did not receive any response to her questions. At that time, Plaintiff had been out of work for approximately three months, and was facing a mountain of medical bills due to her serious illness.

85.      Plaintiff never received a W2 for 2020, nor did she ever receive the termination notice from Amazon required by New York State for departing employees, outlining when her benefits ended.

86.     Amazon has not met the basic legal requirements under New York State Labor Law § 195 for recoupment of alleged overpayment of wages. The email notice Hope received failed to state that she could contest the overpayment even though an employer is required to provide such notice to the employee, including the date by which the employee shall contest, and the procedure by which the employee may contest the overpayment and/or terms of recovery, or to provide a reference to where such procedure can be located.

<u>FIRST CLAIM</u>
(ADA, 42 U.S.C.A. § 12112(a) – DISCRIMINATION)
(Against Amazon)

87.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 86 of this Complaint as if set forth fully herein.

88.     Plaintiff has had at all relevant times, a "disability" as that term is defined in the ADA.[4] Plaintiff was able to perform the essential functions of the job with a reasonable accommodation, and therefore was at all relevant times a "qualified individual with a disability" within the meaning of the ADA.

89.     By firing Plaintiff while she was on medical leave, and by not offering her any reasonable accommodation despite its awareness of her health issues, Amazon has discriminated against Plaintiff on the basis of her disability, in violation of the ADA.

90.     Amazon acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

91.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Amazon's discriminatory practices.

---

[4] https://www.ada.gov/long_Covid_joint_guidance.pdf

<u>SECOND CLAIM</u>
(NYSHRL, Executive Law § 296(1)(a) – DISABILITY DISCRIMINATION)
(Against Amazon)

92.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 91 of this Complaint as if set forth fully herein.

93.  Plaintiff has had, at all relevant times, a "disability" as that term is defined in the NYSHRL. Plaintiff's disability did not prevent her from performing her job with a reasonable accommodation.

94.  By firing Plaintiff while she was on medical leave, and by not offering her any reasonable accommodation despite its awareness of her health issues, Amazon has discriminated against Plaintiff on the basis of her disability, in violation of the NYSHRL.

95.  Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Amazon's discriminatory practices.

<u>THIRD CLAIM</u>
(NYSHRL, Executive Law § 296(6) – AIDING AND ABETTING DISCRIMINATION)
(Against Defendant Finkelstein)

96.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 95 of this Complaint as if set forth fully herein.

97.  New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

98.  Defendant Finkelstein violated Executive Law § 296(6) by knowingly and substantially participating in the discriminatory and retaliatory acts against Plaintiff.

99.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendant Finkelstein's acts and conduct.

<u>FOURTH CLAIM</u>
(NYCHRL, Administrative Code of the City of New York § 8-107(1)(a) – DISABILITY DISCRIMINATION)
(Against All Defendants)

100.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 99 of this Complaint as if set forth fully herein.

101.    Plaintiff has had, at all relevant times, a "disability" as that term is defined in the NYCHRL. Plaintiff's disability did not prevent her from satisfying the essential requisites of her job with a reasonable accommodation.

102.    By firing Plaintiff while she was on medical leave, and by not offering her any reasonable accommodation despite their awareness of her health issues, Defendants have discriminated against Plaintiff on the basis of her disability, in violation of the NYCHRL.

103.    Defendants knew that their actions constituted unlawful discrimination on the basis of Plaintiff's disability and/or showed reckless disregard for Plaintiff's statutorily protected rights.

104.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendants' discriminatory practices.

<u>FIFTH CLAIM</u>
(ADA, 42 U.S.C.A. § 12203(a) – RETALIATION)
(Against Amazon)

105.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 104 of this Complaint as if set forth fully herein.

106.    By beginning to track Plaintiff's alleged performance issues only after her mental health issues became apparent, and demanding wage repayment after her dismissal, Amazon retaliated against Plaintiff for her opposition to unlawful discrimination, in violation of the ADA.

107.    Amazon acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

108.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Amazon's retaliatory acts.

SIXTH CLAIM
(NYSHRL, Executive Law § 296(7) – RETALIATION)
(Against Amazon)

109.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 108 of this Complaint as if set forth fully herein.

110.    By beginning to track Plaintiff's alleged performance issues only after her mental health issues became apparent, and demanding wage repayment after her dismissal, Amazon retaliated against Plaintiff for her opposition to unlawful discrimination, in violation of the NYSHRL.

111.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Amazon's retaliatory acts.

SEVENTH CLAIM
(NYCHRL, Administrative Code of the City of New York § 8-107(7) – RETALIATION)
(Against All Defendants)

112.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 111 of this Complaint as if set forth fully herein.

113.    By beginning to track Plaintiff's alleged performance issues only after her mental health issues became apparent, and demanding wage repayment after her dismissal, Defendants retaliated against Plaintiff for her opposition to unlawful discrimination, in violation of the NYCHRL.

114.    Defendants knew that their actions constituted unlawful retaliation and/or showed reckless disregard for Plaintiff's statutorily protected rights.

115.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendants' retaliatory acts.

<u>EIGHTH CLAIM</u>
(NEW YORK LABOR LAW § 195) – UNLAWFUL DEDUCTION OF OVERPAYMENT)
(Against Amazon)

116.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 115 of this Complaint as if set forth fully herein.

117.    At all relevant times, Plaintiff was an employee within the meaning of New York Labor Law § 190, *et seq*., and any supporting New York State Department of Labor Regulations.

118.    Defendants have willfully failed to comply with the requirements for deducting overpayments required by Article 6, § 195.

119.    Due to Defendants' violations of the NYLL, Plaintiff is entitled to recover her unpaid wages, reasonable attorneys' fees and costs of the action, liquidated damages, and pre- and post-judgment interest pursuant to NYLL § 663(1), *et seq*.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a.      declaring that the acts and practices complained of herein are in violation of the ADA, the NYSHRL, the NYCHRL, and the NYLL;

b.      enjoining and permanently restraining these violations of the ADA, the NYSHRL, the NYCHRL, and the NYLL;

c.      directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff;

d.      directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and retaliatory conduct and making her whole for all earnings and other benefits she would have received but for Defendants' discriminatory treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

e.      directing Defendants to pay Plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

f.      directing Defendants to pay Plaintiff punitive damages as provided by the ADA and the NYCHRL;

g.      awarding Plaintiff unpaid wages under NYLL;

h.      awarding Plaintiff liquidated damages for Defendants' failure to pay all wages to which Plaintiff is entitled, pursuant to the NYLL;

i.      awarding Plaintiff pre- and post-judgment interest;

j.      awarding Plaintiff her reasonable attorneys' fees and costs; and

k.      granting such other and further relief as the Court deems necessary and proper.

DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure,

a trial by jury in this action.

Dated: New York, New York
       May 2, 2022

                     BERKE-WEISS LAW, PLLC


             By:      */s/ Alexandra Berke* _____
                       Alexandra Berke
                       Laurie Berke-Weiss
                       Attorneys for Plaintiff
                       150 E. 52nd Street, Suite 21002
                       New York, NY 10022
                       (212) 888-2680